999 So.2d 1244 (2009)
Fannie WILLIS, Individually and on behalf of the Minor Children, India Walker, Diamond Parker and Ryan Willis, Plaintiff-Appellant
v.
John SMITH, M.D., Defendant-Appellee.
No. 43,958-CA.
Court of Appeal of Louisiana, Second Circuit.
January 14, 2009.
Rehearing Denied February 19, 2009.
*1245 Nelson & Hammons, by John L. Hammons, A. Cornell Flournoy, Shreveport, for Appellant.
Penick & Greening, by Robert L. Greening, James D. "Buddy" Caldwell, Attorney General, Claude W. Bookter, Jr., Special Assistant Attorney General, for Appellee.
Before BROWN, GASKINS and MOORE, JJ.
MOORE, J.
The plaintiffs, the children of the late Yulonda Willis, appeal a jury verdict that absolved Dr. John Smith of medical malpractice in treating Ms. Willis for massive bleeding at the Homer Memorial Hospital emergency room. For the reasons expressed, we affirm.

Factual Background
The 31-year-old Ms. Willis underwent a tonsillectomy at LSU Health Science Center on May 30, 2000, with no reported complications.
Two days later, on June 1 at about 4:00 pm, she came to Homer Memorial's E/R with significant bleeding from her throat; witnesses called it "profuse." Valerie Tuggle, the nurse who checked her in, testified that Ms. Willis was unable to talk, had an unreadable blood pressure and nearly passed out; however, the bleeding had abated by the time the doctor arrived at 4:16. Dr. John Smith, a family practitioner just weeks from completing his residency, *1246 also could not get Ms. Willis to open her mouth. He phoned Dr. Price, her surgeon at LSU; Dr. Price was not called to testify, but according to Dr. Smith, the two agreed that if Ms. Willis was no longer actively bleeding, she could go to LSU by private car. Ms. Willis's family, however, was unable to arrange transportation for the 45-minute drive to Shreveport. She sat in the E/R, relatively stable, for about an hour.
At 5:15, Ms. Willis suddenly began hemorrhaging and gasping, and soon she passed out. Nurses called a Code Blue at 5:17 and again paged Dr. Smith. Following the "ABC" (airway, breathing, circulation) protocol of emergency medicine, Dr. Smith intubated her. He described this as difficult because blood and mucus prevented him from visualizing the back of her throat. The first endotracheal ("ET") tube went down her esophagus. Promptly realizing the mistake, he took out the tube and started again.
The second intubation was at 5:28. Dr. Smith felt it was successful, based on Ms. Willis's breathing sounds and the reading from a device called a capnograph, which indicates CO2 coming out of the lungs. Curiously, however, nothing in the chart or the hospital bill mentioned a capnograph. Dr. Smith admitted he did not order a chest X-ray to confirm proper placement of the ET tube or order an arterial blood gases ("ABG") test for the O2 content of her circulating blood. Instead, he used a standard pulse oximeter clipped to the patient's finger. This showed an O2 saturation level of only 80%, but Dr. Smith felt he had established an airway. He then went to work packing the throat around the ET tube to stop the bleeding. He also administered 10 units of fluid and 6 units of blood, effectively replacing her entire volume of body fluids. The hospital chart recorded no O2 sats until 6:06, when it was 87%; at 6:10 and subsequently it was 99%. Dr. Smith testified that Ms. Willis appeared stable with the standard array of drugs for advanced cardio life support. Timothy Cardwell, an RN in the E/R, testified that the Code Blue ended at 6:03.
Dr. Smith testified that because of her precarious condition, he decided to order a Life Air helicopter to fly her to LSU. Before sending her, he performed a third intubation, explaining that the cuff of the second ET tube might be damaged and could leak in the reduced air pressure of the helicopter. The third intubation was at 6:20; Dr. Smith felt this was successful, again based on breathing sounds, the capnograph display and the pulse oximeter that remained at 99%.
The helicopter carried Ms. Willis to LSU, but she died there about an hour later. A chest X-ray at LSU showed the ET tube was inserted about 4 cm too deep and entered her right lung, allowing the left lung to collapse. An autopsy performed by the late Dr. George McCormick found that she died from severe hemorrhage and hypoxia; it also stated that a nasal catheter inserted during the third intubation had lacerated her lingual artery, causing her to bleed to death.
A Medical Review Panel ("MRP") in February 2005 found that Dr. Smith did not deviate from the standard of care. It noted the difficulty of intubating Ms. Willis because of the large volume of blood in her pharynx, and found his attempts to establish an airway reasonable. It found no evidence as to what caused her acute bleeding, or that anything Dr. Smith did was responsible for it. The MRP accepted Dr. Smith's statement that along with chest and stomach auscultation he used a capnograph to confirm that the second and third intubations were successful, even though this was not charted. Further, X-rays and ABG tests were not required during the intensive efforts to resuscitate *1247 the patient. Still further, the cuff on the second ET tube could have been damaged by contact with Ms. Willis's teeth during insertion, and a leaky cuff is not below the standard of care; Dr. Smith met the standard by attempting to replace the tube before transporting the patient. Finally, the third ET tube achieved an adequate airway but was probably displaced during the helicopter ride. The MRP concluded that Dr. Smith's acts neither deviated from the standard of care nor caused Ms. Willis's death.

Procedural History and Trial Evidence
Ms. Willis's three minor children, represented by their grandmother Fannie Willis, filed this suit against Dr. Smith.[1] By pretrial order filed April 17, 2007, the plaintiffs listed Dr. Sheldon Kottle of Phoenix, Arizona, as one of their expert witnesses. About a month before trial, Dr. Smith filed a motion in limine to exclude Dr. Kottle's expert testimony on grounds that he was not qualified in emergency medicine. Dr. Kottle was board-certified in nephrology and hypertension and once was an associate professor of internal medicine and family practice at LSU, but had no special training (and only limited experience) in emergency medicine. After jury selection, the district court granted the motion and excluded Dr. Kottle.
Trial took place over five days in February 2008. The plaintiffs' lead witness, Dr. Walter Simmons of Phoenix, Arizona, testified as an expert in emergency medicine. He was highly critical of Dr. Smith, stating that he never established an airway for Ms. Willis and damaged the back of her throat in his attempts. Even after the second intubation, Ms. Willis's O2 sat remained around 80% for 50 minutes, dangerously low compared to the normal of 98-100%. Relying on the medical chart, Dr. Simmons accepted that Dr. Smith did not use a capnograph or perform an ABG test or chest X-ray, all breaching the standard of care. He theorized that the eventual elevation of Ms. Willis's O2 sat to 99% resulted from the infusion of six units of fresh blood, not from the second intubation. He testified that even Dr. Smith must have felt the second intubation was a failure, or else he would not have pulled it at 6:20. Dr. Simmons also accepted the coroner's report that Dr. Smith lacerated Ms. Willis's lingual artery while inserting a nasal catheter, causing her to "bleed out."
On rebuttal, Dr. Simmons insisted that when Ms. Willis first came to the E/R her blood loss was "minimal." He called it the "height of folly" not to send her to LSU by ambulance or helicopter as soon as she stabilized. He reiterated that Dr. Smith breached the standard by failing to pull the second ET tube when her pulse oximeter stayed at 80%; allowing it to stay that low for 50 minutes virtually guaranteed brain damage.
The rest of the plaintiffs' case consisted of lay testimony and the expert opinion of Dr. Melvin Harju, who projected an economic loss to the plaintiffs of $395,114 as a result of Ms. Willis's death.
In his defense, Dr. Smith testified as outlined above, explaining in detail each step of his emergency treatment. He disputed the plaintiffs' assertion that Ms. Willis lay 50 minutes with a dangerously low pulse oximeter reading of 80%; the capnograph showed a robust CO2 outflow, and he was adamant that he did indeed use the device even though he did not dictate this into the chart.
Two members of the MRP, Dr. Michael Harlan of Covington and Dr. Max Stell of Minden, elaborated on the findings in their report. They testified that ABG tests and *1248 chest X-rays were not the standard of care, once Dr. Smith established an airway; they found no deviation from the standard.
Dr. Smith's attending physician, Dr. Donald Haynes, also site coordinator for the rural track of LSU's family medicine program, testified that Dr. Smith did an "excellent job in a bad situation." He disagreed with the autopsy report, and testified that the soft nasal catheter could not have caused any bleeding. Three nurses testified, including Julie Ann Murray, an LPN who stated that when Ms. Willis first arrived at the E/R, she could talk and reported that she had been out mowing her grass when she started bleeding out her mouth and nose.
The defense's lead witness was Dr. Joseph Litner of Metairie, who analyzed the medical records in detail. He described Ms. Willis's case as "a pretty horrendous situation" for Dr. Smith. He accepted Dr. Smith's testimony that he used a capnograph which showed a sufficient, if borderline, airway function, and felt the second intubation was a success because her pulse oximeter eventually reached a normal 99%. In the circumstances, Dr. Litner agreed with leaving in the second tube until the patient stabilized. He also said it was not unusual for the cuff of an ET tube to get damaged by the patient's teeth; the leaky cuff in Ms. Willis's second intubation was not a deviation from the standard of care. He testified that a nasal catheter was soft and pliable, and could not have severed the lingual artery; this injury must have occurred during the tonsillectomy, even though the LSU records described that procedure as "unexceptional." He added that Ms. Willis was bleeding profusely before Dr. Smith ever touched her.
By a vote of 9-3, the jury found that Dr. Smith did not breach the standard of care. The plaintiffs have appealed, raising three assignments of error.

Discussion: Exclusion of Expert Witness
By their first assignment of error, the plaintiffs urge the district court erred in excluding the expert medical testimony of Dr. Kottle as to both liability and causation. They quote from his curriculum vitae and narrative report, particularly his "10-point clarification" of Dr. Litner's report, contending that these show his superlative credentials. They submit that Dr. Kottle's expertise was near enough to emergency medicine to warrant including it, and that the court improperly used the locality rule to exclude it.[2] The supreme court has reversed judgments for the improper exclusion of a medical expert, as in Roberts v. Warren, XXXX-XXXX (La.6/29/01), 791 So.2d 1278, and Leyva v. Iberia General Hosp., 94-0795 (La.10/17/94), 643 So.2d 1236. They assert that this error interdicted the fact-finding process, mandating de novo review.[3]
*1249 Dr. Smith responds that the court did not abuse its discretion in finding that Dr. Kottle would not aid the court in rendering a decision as to emergency medicine. He also shows that in deposition, Dr. Kottle disclaimed any expertise in emergency medicine and advised plaintiffs' counsel to use his nephew, Dr. Simmons, who actually testified.
The admission of expert testimony is governed by La. C.E. art. 702:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and this discretion will not be disturbed by an appellate court unless it is clearly erroneous. Mistich v. Volkswagen of Germany Inc., 95-0939 (La.1/29/96), 666 So.2d 1073; Johnson v. English, 34,322 (La.App. 2 Cir. 12/20/00), 779 So.2d 876, and citations therein.
In his written narrative, Dr. Kottle stated that Dr. Smith breached the standard of care in various ways, and that the third intubation likely severed Ms. Willis's lingual artery. In his deposition he reiterated these positions but admitted that his board certification was in nephrology and hypertension, not emergency medicine, and since his internal medicine rotation in the late 1970s until his retirement in 1996, he had intubated only five or six patients. Over his career he had reviewed many cases as an expert in nephrology and hypertension, never in emergency medicine. When contacted by plaintiffs' counsel, he rendered an opinion mainly to refer the case to his nephew, Dr. Simmons. He candidly stated:
My disclaimer is that I haven't intubated anyone since the time I told you. I am not an expert in emergency medicine. I got kind of drug into this backwards. As long as you know all the disclaimers you know then. Since it was his [plaintiffs' counsel's] dime and I told him it is his dime, I took his dime. But I am not an expert nor should I be sworn in as an expert in emergency medicine.

(Emphasis added.)
Based on these admissions as to his credentials, the district court was not clearly erroneous in excluding Dr. Kottle's testimony. Moreover, any expert opinion which the plaintiffs sought to introduce through Dr. Kottle was made known to the court through Dr. Simmons. La. C.E. art. 103 A(2); Johnson v. English, supra. Finally, there is nothing in the court's ruling or elsewhere to indicate that the locality rule played any part in the court's ruling. This assignment of error lacks merit.

Finding of No Malpractice
By their second assignment of error the plaintiffs urge the jury erred in finding that Dr. Smith did not deviate from the applicable standards of care. They allege, and argue in great factual detail, four separate acts of substandard care:
(1) Dr. Smith failed to establish an airway in that he failed three times to properly intubate Ms. Willis.
(2) Dr. Smith negligently lacerated the lingual artery, causing massive hemorrhage.
(3) Dr. Smith negligently failed to timely transfer Ms. Willis to LSU.
(4) Dr. Smith failed to take appropriate steps to address Ms. Willis's hypoxia that continued unabated for 50 minutes.
*1250 They conclude that Dr. Smith's acts of malpractice were a substantial contributing factor in Ms. Willis's death.
Dr. Smith responds that manifest error protects the jury's decision to accept one of two or more permissible views of the evidence. Stobart v. State, 92-1328 (La.4/12/93), 617 So.2d 880. He submits that for every alleged breach, the jury made a rational finding based on credible evidence.
To establish a claim for medical malpractice, the plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant, (2) that the defendant breached that standard of care, and (3) a causal connection between the breach and the resulting injury. La. R.S. 9:2794 A; Samaha v. Rau, XXXX-XXXX (La.2/26/08), 977 So.2d 880; Thomas v. Willis-Knighton Med. Center, 43,176 (La.App. 2 Cir. 4/30/08), 981 So.2d 807, writ denied, XXXX-XXXX (La.9/19/08), 992 So.2d 932.
Because the plaintiffs have not shown any legal error that interdicted the fact-finding process, the manifest error standard applies. Under this standard, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Salvant v. State, 2005-2126 (La.7/6/06), at p. 5, 935 So.2d 646, 650, and citations therein. Even if it would have decided the case differently, the appellate court must not reweigh the evidence or substitute its own factual findings. Id. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or plainly wrong. Id. Where documents or objective evidence so contradict a witness's story that no rational juror could credit it, the court of appeal may find manifest error even in a finding purportedly based on a credibility determination; however, when such factors are not present, and the finding is based on a credibility call, that finding can virtually never be manifestly erroneous or plainly wrong. Id.; Stobart v. State, supra.
The failed intubations. Both sides agree that the first intubation entered Ms. Willis's esophagus and was incorrect, but Dr. Smith quickly removed it. They also seem to agree that the second ET tube was defective in that its cuff was compromised and leaked air. Dr. Simmons testified that Dr. Smith should have noticed this promptly, as the patient's O2 sat did not immediately rise from 80% to the upper 90s. Dr. Simmons also rejected Dr. Smith's claim that he used a capnograph to confirm a robust discharge of CO2 from the patient's lungs: no other eyewitnesses (Nurses Tuggle and Cardwell, and Dr. Haynes) recalled anything about a capnograph; the respiratory therapist, who would have assisted Dr. Smith in placing the capnograph, was not called to testify[4]; and neither Dr. Smith's own chart nor the hospital bill mentioned the use of, or charges for, a capnograph.
Dr. Smith testified that he used a capnograph, received a good CO2 reading, and listened to both sides of the patient's chest, confirming a successful intubation. Dr. Litner and the two members of the MRP who testified all accepted Dr. Smith's position, explaining that in the desperate attempt to resuscitate the patient, Dr. Smith could well have omitted to chart that he used the device. Dr. Smith also testified that because Ms. Willis's O2 sat eventually rose to 99%, he considered the intubation successful. Dr. Haynes testified that given her significant blood loss, the pulse *1251 oximeter readings in the low 80s would not have been reliable.
We must admit that the utter silence of the hospital records and (most perplexingly) the hospital bill as to a capnograph, together with the lack of corroboration from anybody who was present in the E/R, bring this case very close to one in which "documents or objective evidence so contradict a witness's story" that the finding could be plainly wrong. However, the jury was in the superior position to evaluate Dr. Smith's credibility on this purely factual issue, and to weigh the defense witnesses' view that Dr. Smith's incomplete charting was reasonable in the pressure of the E/R. Finally, Dr. Haynes testified that Ms. Willis's blood loss would have made the early readings from the pulse oximeter unreliable, a point not addressed by Dr. Simmons. On this conflicting evidence, we cannot find manifest error.
As for the third intubation, Dr. Simmons testified that the ET tube was placed too deep; it maintained her O2 sat but allowed her left lung to collapse. Dr. Litner testified that the tube was correctly but not ideally placed; Dr. Smith maintained that he placed it properly, but it could have been "jostled" during the helicopter ride. On this evidence, the jury could rationally find that Dr. Smith properly inserted the third ET tube but it was displaced after Ms. Willis left the hospital.
Laceration of the lingual artery. Both sides agree that Ms. Willis's lingual artery was severed, resulting in her death. The autopsy report by the late Dr. McCormick stated that something during the emergency procedure lacerated the artery; Dr. Simmons agreed that Dr. Smith's placement of a nasal catheter did this; and nothing in the LSU record indicates that the artery was injured during the tonsillectomy. Dr. Litner testified, however, that it was impossible to tell when the laceration occurred, and the autopsy pathologist could only speculate how it happened. He added that such an injury was a "known but rare complication of tonsillectomy," and that bleeding could occur days later. Both Dr. Litner and Dr. Haynes stated that the nasal catheter was simply too soft to cause any bleeding.
All witnesses, except Dr. Simmons, agreed that Ms. Willis had significant bleeding before Dr. Smith began emergency procedures. A rational juror could find that the widely conflicting expert testimony failed to overcome the strong inference that the laceration predated any action of Dr. Smith.
Failure to transfer timely. The record shows that after her initial presentation with severe bleeding, Ms. Willis stabilized by 4:16 pm and remained stable until the second incident at 5:15. Dr. Smith testified that by helicopter or ambulance, Ms. Willis could have been transported to LSU in about 40 minutes; other things being equal, she could have been in a superior E/R before the second incident. Dr. Simmons testified that family members are not paramedics, and the patient's condition was too unstable; thus it was the "height of folly" to consider private transportation to LSU.
By contrast, Dr. Smith maintained that both he and Dr. Price felt Ms. Willis was sufficiently stabilized at 4:15 to ride to LSU by private car. The plaintiffs did not call Dr. Price to dispute Dr. Smith's version of their conversation. The lady who drove Ms. Willis to Homer Memorial, her aunt Gwendolyn, who is also a Claiborne Parish civil deputy, admitted that Dr. Smith told her to drive Ms. Willis to LSU; she described trying to call various other relatives but getting no answers. She did not state that she conveyed this information to Dr. Smith, or explain why she herself could not drive her niece to LSU.
*1252 The plaintiffs' showing is admittedly strong, as an early decision to use an ambulance or helicopter would have greatly improved Ms. Willis's chance of survival. However, without evidence to contradict Dr. Smith's assessment of the patient at 4:15, or that Dr. Smith was even aware that family members could not drive her to LSU, we cannot say the jury was plainly wrong to find no breach of the standard of care.
Uncontrolled hypoxia. All experts agreed that an O2 sat in the 80s for 50 minutes was a life-threatening condition. Dr. Simmons testified that this resulted from the three failed intubations. Dr. Smith, however, maintained that because of significant blood loss Ms. Willis did not have sufficient blood volume to carry O2 molecules to her head and extremities. After the airway was established, it would take time to control the bleeding and restore her blood supply. Unfortunately, this was not fast enough to restore a good blood flow to her brain before signs of hypoxia appeared.
On this evidence, a rational jury could find that with the extent of her blood loss, only extraordinary measures would have saved Ms. Willis. Although Dr. Simmons held the opposite view, the jury could accept the assessment of Drs. Litner, Harlan and Haynes that Dr. Smith did an excellent job in a horrendous situation. We simply cannot say that the jury's findings are plainly wrong. This assignment of error lacks merit.

Conclusion
In light of our discussion on liability, we pretermit consideration of the plaintiffs' third assignment of error, which submits that damages exceed the statutory cap of $500,000.
For the reasons expressed, the verdict and judgment are affirmed. Costs are to be paid by the plaintiffs, Fannie Willis, individually and on behalf of Diamond Parker and Ryan Willis, and India Walker.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, GASKINS, PEATROSS, DREW, and MOORE, JJ.
Rehearing denied.
NOTES
[1] One of the children, India Walker, attained majority during these proceedings. Homer Memorial Hospital was not named as a defendant.
[2] General practitioners are held to only the standard of care practiced "in a similar community or locale" while specialists are held to the standard of care "within the involved medical specialty." La. R.S. 9:2794 A(1).
[3] The plaintiffs also assert that Dr. Smith did not file his motion in limine to exclude Dr. Kottle until January 31, 2008, less than a month before the trial date of February 25, 2008, "and the objection was not timely raised pursuant to the order signed by the trial court on April 17, 2007." On review, however, we find nothing in the court's three orders of April 17, 2007, or in any other pretrial order, fixing any cutoff date for objections, as it might under La. C.C.P. art. 1551 A(5). Since Dr. Kottle's deposition was not taken until July 2007, nearly three months after the pretrial orders, we cannot say the district court abused its discretion in entertaining the motion in limine filed 25 days before trial.
[4] The plaintiffs attempted to impeach Dr. Smith with the respiratory therapist's sworn statement that she did not even know what a capnograph was; this statement was not admitted into evidence, but Dr. Smith admitted that she said it.