GASKINS, J.
[iThe plaintiff, Leila Wells, mother of the decedent, Kerry Scarborough, appeals from a trial court judgment and jury verdict finding that the defendants, the Louisiana Department of Public Safety and Corrections (“DPSC”); the Madison Parish Law Enforcement District; Charles R. Harmon, Jr., former sheriff of Madison Parish; and E.A. Conway Medical Center (“Conway”), did not fail to render reasonable and adequate medical care to the decedent. For the following reasons, we affirm the trial court judgment.
FACTS AND PROCEDURAL HISTORY
In March 1993, Mr. Scarborough, who lived in the Tallulah, Louisiana area, saw a doctor at a clinic in Vicksburg, Mississippi, complaining of pain in his left back. In June 1993, Mr. Scarborough returned to the clinic and saw Dr. Fitten Lamar McMillan, complaining of left back scapular discomfort. Mr. Scarborough weighed 128 pounds and smoked one package of cigarettes per day. Mr. Scarborough’s chest x-ray showed bullous changes at the lung apexes indicative of emphysema. He also had mild arthritic changes to bony structures. No destructive lesions were observed.
Mr. Scarborough had been convicted of distribution of marijuana and was sentenced to serve seven years at hard labor. The sentence was suspended and he was placed on probation. In 1993, Mr. Scarborough was convicted of DWI and possession of marijuana. As a result of these subsequent convictions, Mr. Scarborough’s probation was revoked and he |2was ordered to serve the seven-year sentence. He was remanded to the custody of the DPSC on August 27,1993.
Mr. Scarborough was placed in the Madison Parish Detention Center (“MPDC”), a facility run by the Madison Parish Sheriffs Office, which houses DPSC prisoners. Mr. Scarborough was assigned to that facility from August 27, 1993, until January 10, 1995. Because of his continuing complaints of pain, he was frequently seen by the nurse at MPDC and by Dr. Thomas Arthur Neumann, the physician who treated patients from MPDC.
In November 1993, Dr. Neumann referred Mr. Scarborough to Conway where a CT scan of his neck was done and showed no abnormalities. Mr. Scarborough’s complaints of pain continued and he was hospitalized from December 23 through December 30, 1993, at Conway. He complained of shoulder pain as well as mid-back and neck pain that had been going on for one year. Tests were conducted including x-rays, blood work, and tests for tuberculosis. Mr. Scarborough’s weight was still listed as 128 pounds at that point. Chest x-rays showed chronic scarring of both pulmonary apexes with small apical cysts. No tumors were found. *914 He was discharged with a diagnosis of positive tuberculosis (“TB”) exposure that was inactive. He was prescribed medication for TB and pain.
Mr. Scarborough returned to Conway in June 1994. There was no change in his chest x-ray. A CT scan of his neck was done and the results were normal. Mr. Scarborough’s weight was 123 pounds, reflecting alaweight loss of five pounds. Mr. Scarborough was told to return to Conway in November 1994.
In December 1994, Mr. Scarborough was sent to Conway. His weight had dropped to 119 pounds and he continued to complain of neck, back, and left shoulder pain. A bone scan was performed and showed that Mr. Scarborough had lung cancer which had affected the first, second, and third ribs and the vertebrae in his neck. Portions of the ribs had been consumed by the cancer. Mr. Scarborough also had a cyst or lesion on his neck.
On January 10, 1995, Mr. Scarborough was transferred to Elayn Hunt Correctional Center, a DPSC facility, and was then sent to David Wade Correctional Center, another DPSC facility, on January 23, 1995. Mr. Scarborough was conclusively diagnosed with lung cancer on February 17, 1995, after a biopsy performed at Conway. He had a Pancoast lung cancer tumor which is rare and is seldom diagnosed before it causes symptoms. By the time most of these cancers are diagnosed, they have progressed to the point where there is little chance of survival. The tumor was located high on the left lung and was difficult, if not impossible, to see on earlier chest x-rays.
On February 27, 1995, Mr. Scarborough received a medical furlough from prison and was released to his mother’s home where he stayed until his death on March 30, 1995. Mr. Scarborough was 35 years old at the time of his death.
On March 29, 1996, Mrs. Wells filed suit against the DPSC, Madison Parish Law Enforcement District, and Sheriff Harmon, alleging that their | ¿fault, negligence, and deliberate indifference to Mr. Scarborough were the sole and legal cause of the rapid progression of his illness and his untimely death. She later amended her petition to add Conway as a defendant. Mrs. Wells alleged that the defendants failed to provide adequate and complete medical care to Mr. Scarborough although he repeatedly requested it, and that they failed to provide complete and adequate medical care regarding his obvious medical needs such as significant weight loss, chronic back and shoulder pain, and lumps on his shoulder and neck. Mrs. Wells claimed that her son was transported from facility to facility to get rid of an obviously terminally ill inmate and to avoid obtaining the necessary medical care for him. During the proceedings, Mrs. Wells claimed that Mr. Scarborough frequently was not given his medications at MPDC and on one occasion, his pain medication was left out and was stolen. She asserted that the MPDC personnel did not have the medication replaced. She urged that the defendants were negligent and deliberately indifferent to the serious medical needs, welfare, and life of Mr. Scarborough.
Mrs. Wells claimed that she suffered emotional pain and suffering and mental anguish and loss of consortium for the loss of her son. She also asserted a survival action for the physical and mental pain and suffering Mr. Scarborough sustained prior to his death.
Many procedural matters were raised in the years prior to trial. The plaintiff propounded interrogatories to the sheriffs office concerning its understanding of the relationship between the sheriffs office and the DPSC. When the plaintiff was *915 not satisfied with the responses, she filed a motion to | r,compel in the trial court. The trial court denied the motion to compel, finding that the discovery requests sought a legal opinion from the sheriff which he was not required to provide. The plaintiff applied for supervisory writs to this court. In Wells v. State, Department of Public Safety and Corrections, 41,836 (La.App.2d Cir.3/7/07), 954 So.2d 234, we found that the plaintiffs discovery requests called for legal conclusions based upon statutory or contractual law and were inappropriate. We affirmed the trial court judgment.
The DPSC and the sheriffs office filed motions for summary judgment which were denied by the trial court. The defendants’ writ applications from those rulings were denied by this court.
The DPSC filed a motion in limine to exclude any testimony from Dr. Harrison M. Lazarus, a trauma and vascular surgeon, on the grounds that he did not have the expertise to express an opinion on the timing and propriety of nonsurgical examination, testing, and diagnosis of cancer.[1] The trial court granted the motion in li-mine, excluding the testimony of Dr. Lazarus. The plaintiff applied for supervisory writs with this court. On August 28, 2008, this court denied the writ application concerning Dr. Lazarus.
The issues as to the DPSC were tried before a jury and those pertaining to Conway and the MPDC were tried by the court alone. Shortly before the start of the trial in August 2010, the plaintiff filed a motion in the trial court arguing that there should be a jury trial as to both the DPSC and Conway. The motion was denied by the trial court. The plaintiff applied Ififor an emergency writ with this court. On August 24, 2010, we denied the writ application on the showing made.
The case was tried August 24-27, 2010. The jury rejected the plaintiffs claims against the DPSC, finding that the DPSC did not breach its duty to provide reasonable, adequate medical care to Mr. Scarborough. The trial court rendered a verdict in favor of MPDC and Conway. As to MPDC, the court noted that there were possibly times when medication was not given in a timely fashion. However, the court found that those actions were not the cause of Mr. Scarborough’s death and did not rise to the level to create liability on the part of the MPDC for failure to provide adequate medical care to Mr. Scarborough. The trial court observed that Mr. Scarborough was taken to Conway frequently for consultation, treatment and hospitalization, that he saw the nurse at the prison numerous times, and that he was seen by Dr. Neumann. According to the trial court, the MPDC did not cause the injuries sustained by Mr. Scarborough.
As to Conway, the court observed that in a medical malpractice case, the plaintiff must prove by a preponderance of the evidence the standard of care that is required of the doctors who attended Mr. Scarborough and that proof must be provided by expert testimony. The court found that no expert testified on behalf of the plaintiff as to the duty of diagnosing cancers of this type.
The court stated that the plaintiff was also required to prove by a preponderance of the evidence that a breach in the standard of care occurred. The court found that all the doctors who testified in this matter |7said that Pancoast tumors are rare, hard to detect, and when detected, *916 have usually progressed to the point that there is no available treatment.
The court noted that the plaintiff was required to prove causation. In this case, the plaintiff made no showing that treatment or failure to diagnose and treat the cancer by Conway was a legal cause of Mr. Scarborough’s death. The trial court found that there was nothing that could have been done to save Mr. Scarborough. The plaintiff appealed, asserting numerous assignments of error.
EXPERT TESTIMONY
In its oral reasons for judgment, the trial court stated that Mrs. Wells failed to provide the expert testimony necessary to establish the standard of care required of the doctors at Conway who attended Mr. Scarborough. Mrs. Wells essentially argues that the trial court erred in excluding or limiting the testimony of her expert witnesses offered to establish the applicable standard of care and that these rulings were fatal to her claim against Conway. Mrs. Wells asserts that the trial court applied the Daubert standard for the acceptance of expert witnesses strictly to her experts and leniently to the defendants’ experts. She contends that the trial court erred in holding that Mr. Scarborough’s treating physician, Dr. Kenneth Steier, could not be judged under the standard of care applicable to general practitioners. She claims that the trial court erred in excluding the testimony of her expert, Dr. Lazarus, concerning the standard of care for all physicians. She asserts as error the trial court’s exclusion of the testimony of her expert, Dr. Lawrence Chenier, concerning the standard of care of |sfamily practitioners, as well as the standard of care of all physicians. She contends that specialist testimony was not necessary to establish the applicable standard of care in this case because Conway violated the standards of basic medicine. These arguments are without merit.
Legal Principles
It is well settled that a hospital is liable for its employee’s negligence, including its doctors and nurses, under the re-pondeat superior doctrine. Little v. Pou, 42,872 (La.App.2d Cir.1/30/08), 975 So.2d 666, writ denied, 2008-0806 (La.6/6/08), 983 So.2d 920.
In a malpractice claim against a hospital, the plaintiff is required to prove by a preponderance of the evidence, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved (or the applicable standard of care), that the defendant breached its duty (or the applicable standard of care), and the injury was caused by the breach. La. R.S. 9:2794(A); Little v. Pou, supra. The requirements for establishing a claim for medical malpractice are set forth in La. R.S. 9:2794, which provides in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
|9(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and dili- *917 genee, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
A physician is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised, and not on the basis of hindsight or in light of subsequent events. Johnston ex rel. Johnston v. St. Francis Medical Center, Inc., 35,236 (La.App.2d Cir.10/31/01), 799 So.2d 671.
To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794. Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Schultz v. Guoth, 2010-0343 (La.1/19/11), 57 So.3d 1002.
The admission of expert testimony is governed by La. C.E. art. 702, which states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by ’knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
hpThe Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993), adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding the proper standards for the admissibility of expert testimony, which requires the trial court to perform a “ga-tekeeping” function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.[2] In so doing, the supreme court adopted Dau-bert’s requirement that technical or scientific expert testimony must rise to a threshold level of reliability before it is admissible under La. C.E. art. 702. While the trial court may consider one or more of the four Daubert factors, those factors do not necessarily or exclusively apply to all experts or in every case. State v. Taylor, 42,627 (La.App.2d Cir.10/24/07), 968 So.2d 1135, writ denied, 2008-0424 (La.l 1/10/08), 996 So.2d 1063.
Generally, an expert must satisfy the trial judge that he or she is qualified to give testimony regarding the applicable standard of care. McCurdy v. Ault, 94-1449 (La.App.1st Cir.4/7/95), 654 So.2d 716, writ denied, 95-1712 (La.10/13/95), 661 So.2d 498. A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and this discretion will not be disturbed by an appellate court unless it is clearly erroneous. Willis v. Smith, 43,958 (La.App.2d Cir.1/14/09), 999 So.2d 1244.
*918 | uDaubert Standard
Mrs. Wells claims that Conway and its employees committed medical malpractice in the treatment of Mr. Scarborough.[3] The plaintiff was required to establish the standard of care applicable to the treatment of the decedent, that Conway breached that duty, and that the breach resulted in the harm sustained. Mrs. Wells contends that the trial court applied the Dau-bert standard for accepting or rejecting expert witnesses in an uneven manner in this case. This argument is not supported by the record.
The trial court’s duty was to ensure that expert witnesses were relevant and reliable. The trial court in this case evaluated the qualifications of the experts presented by both the plaintiff and the defendants. The defendants’ witnesses possessed the required qualifications in the stated specialties and the plaintiffs did not. The trial court did not abuse its discretion in its decisions regarding the testimony of expert witnesses.
Dr. Steier
In the trial court, Mrs. Wells filed two motions in limine to exclude the testimony of Dr. Steier, an osteopath who treated Mr. Scarborough at Conway. She argued that Dr. Steier had only a basic medical license and should have been judged under the standard of care applicable to general practitioners rather than under the standard of care applicable to internal medicine and pulmonary care. Mrs. Wells claims that the trial court erred in denying her motions in limine.
|12Pr. Steier was in charge of Mr. Scarborough’s care at Conway during his December 1993 hospitalization. Dr. Steier currently lives in the state of New York and gave a video deposition for trial. Dr. Steier received a degree of osteopathic medicine in 1983. He completed an osteopathic internal medicine internship in 1986 and a fellowship in pulmonary and critical care in 1988. Dr. Steier had a National Public Health scholarship which paid for his medical education in exchange for fulfilling a public health obligation in a health shortage area. To fulfill that obligation, Dr. Steier came to Conway in January 1992 as an assistant professor of medicine. Dr. Steier took the Louisiana medical licensing exam and was licensed to practice medicine in this state on February 10, 1993. While working at Conway, Dr. Steier was involved in training medical students and treating patients at the hospital.
Mrs. Wells contends that Dr. Steier, as a doctor of osteopathic medicine, was not a medical doctor and was not an internal medicine or pulmonary care specialist. Therefore, she claims that the trial court erred in requiring her to establish by expert testimony the standard of care applicable to internal medicine and internal care rather than regarding Dr. Steier as simply a general practitioner. The record shows that Dr. Steier possessed qualifications as an osteopath trained in internal medicine and pulmonary and critical care at the time he treated Mr. Scarborough. The trial court did not abuse its discretion in denying Mrs. Wells’ motions in limine.
11sDr. Lazarus
The plaintiff sought to offer the expert testimony of Dr. Lazarus to establish the applicable standard of care required of Conway and its physicians in the *919 diagnosis and treatment of Mr. Scarborough’s lung cancer. However, Dr. Lazarus was a trauma surgeon who did not diagnose or treat lung cancer. The defendants filed a motion in limine opposing his testimony on the grounds that he lacked the expertise necessary to establish the requisite standard of care. The trial court granted the motion in limine and, on the showing made, this court denied the plaintiffs writ application.
Mrs. Wells now seeks appellate review of the trial court decision and the defendants argue that review is barred by the doctrine of law of the case. We note that the portion of Mrs. Wells’ writ application objecting to the trial court grant of the motion in limine, not allowing Dr. Lazarus to testify, was denied on the showing made. This court did not consider the merits of the trial court’s ruling, but merely declined to exercise our supervisory jurisdiction. Therefore, the doctrine of law of the case does not apply to this issue. See and compare Eastin v. Entergy Corporation, 07-212 (La.App.5th Cir.10/16/07), 971 So.2d 374, writ denied, 2007-2214 (La.1/11/08), 972 So.2d 1167; World Trade Center Taxing District v. All Taxpayers, Property Owners, and Citizens of World Trade Center Taxing District, 2004-1365 (La.App.4th Cir.9/1/04), 883 So.2d 459, writ denied, 2004-2282 (La.10/29/04), 885 So.2d 599.
We have now reviewed the merits of the claim and find that the trial court correctly granted the motion in limine, excluding the testimony of Dr. |uLazarus. The witness was a trauma surgeon who did not diagnose or treat cancer. Dr. Lazarus was not qualified to offer an expert opinion on the standard of care for diagnosing and treating Mr. Scarborough’s lung cancer. See and compare Willis v. Smith, supra, holding that the trial court did not err in prohibiting a specialist in nephrology and hypertension from testifying as to the standard of care for an emergency room physician. The trial court did not abuse its discretion in finding that Dr. Lazarus was not qualified to testify regarding the applicable standard of care in this case.
Dr. Chenier
Mrs. Wells claims that the trial court erred in excluding the testimony of Dr. Chenier concerning the standard of care of family practitioners and the standard of care of all physicians. At trial, the plaintiff tendered Dr. Chenier as an expert in emergency medicine and family practice. In setting forth his qualifications, Dr. Che-nier stated that he began, but did not complete, a residency in internal medicine. He was certified as an emergency room physician and had engaged in family practice in the community for many years. The defense objected to allowing the witness to testify as to the standard of care for family practice physicians because he had not completed a residency in that area.
Dr. Chenier was not an internist, radiologist, or oncologist. Although he had practiced family medicine for many years, he had not received training in that specialty and was not board certified as a family practice physician. Based upon these facts, the trial court refused to accept him as an expert in family practice medicine. The trial court sustained the defense 115objection and allowed Dr. Chenier to testify only as an expert in the general practice of medicine.
The fact that the trial court did not allow Dr. Chenier to testify as an expert in family practice is of no significance. He was allowed to testify as to the basic standard of care applicable to all physicians. Dr. Chenier was questioned about Mr. Scarborough’s diagnosis of TB made at Conway and stated that the type of shoulder pain complained of by Mr. Scarbor *920 ough was not a standard symptom of TB. He testified that, as a general practitioner of medicine in 1993, he would have ordered a CT scan or MRI of Mr. Scarborough’s left shoulder and upper chest right away and would have referred him to an oncologist if the tests had shown a tumor. Dr. Chenier also testified that Pancoast lung cancer tumors are very hard to diagnose until they are advanced. Therefore, although Dr. Chenier was not allowed to testify as to the standard of care for family practice physicians, he was allowed to express his expert opinion that a general practitioner would have ordered additional testing to diagnose the cause of Mr. Scarborough’s pain. The trial court’s decision regarding the expert qualifications of Dr. Chenier did not prevent the plaintiff from eliciting testimony that, under the circumstances of this case, he thought that the standard of care for all physicians would have required additional testing to diagnose the cause of Mr. Scarborough’s continuing pain.
We also find that, even judging the actions of the physicians at Conway according to the standard of care required of all physicians, a standard arguably less than that required of specialists, the evidence failed | ^to show any breach of that standard of care by the hospital or its employees. Dr. Chenier and Dr. Steier testified that Mr. Scarborough had a rare form of lung cancer that is generally not symptomatic until it has progressed to the point that it is not survivable. Dr. Robert Golson, an expert in radiology, testified that a CT scan of Mr. Scarborough’s shoulder in 1993 would have detected the tumor when the patient was complaining of pain.[4] However, Dr. Golson stated that Pancoast tumors are seldom diagnosed before they cause symptoms and at that point are Stage III or Stage IV cancers.
Dr. Robert L. Ebeling, Jr., a radiation oncologist who saw Mr. Scarborough briefly in February 1995, reiterated that Pan-coast tumors are rare and account for only 3 percent of all lung cancers. They do not involve major airways and do not cause the usual symptoms of lung cancer. They cause pain when they go outside the lung and at that point, there is little hope of successful treatment.
The record shows that Mr. Scarborough had a rare form of cancer which is hard to diagnose and is generally discovered only after it is symptomatic and has progressed beyond the point of survivability. The record also shows that Mr. Scarborough was having pain in his shoulder and neck, symptoms indicative of this type of cancer in 1993 prior to the time he entered prison. The record shows that the physicians at Conway continued to test Mr. Scarborough until, eventually, his cancer was discovered. This evidence does not show any breach of the standard of care by Conway or any of its employees in the diagnosis of Mr. Scarborough’s cancer.
J^EXPERT WITNESS REPORT
Mrs. Wells contends that the trial court erred in allowing Dr. Steier to offer expert testimony on areas outside the scope of what she terms the “treating physician exception” of La. C.C.P. art. 1425. Mrs. Wells urges that when Dr. Steier examined Mr. Scarborough at Conway in December 1993, he had a degree as a doctor of osteopathy, a medical license from Louisiana, and was board certified in osteopathic internal medicine. She essentially argues that Dr. Steier was not a *921 medical doctor and was not a specialist in pulmonary medicine. Mrs. Wells asserts that, under the treating physician exception to the expert report requirement, Dr. Steier could only offer and explain the opinions he formed in December 1993, based upon his observations at that time. She claims that she was ambushed when the trial court allowed the defendants to bootstrap Dr. Steier’s testimony as a treating physician to allow him to offer an opinion as an expert pulmonologist.
Legal Principles
La. C.C.P. art. 1425 governs the use of expert witnesses and the requirement, that after a contradictory motion, experts must furnish reports outlining their opinions and the reasons upon which the opinions are based. That statute provides in pertinent part:
A. A party may through interrogatories or by deposition require any other party to identify each person who may be used at trial to present evidence under Articles 702 through 705 of the Louisiana Code of Evidence.
B. Upon contradictory motion of any party or on the court’s own motion, an order may be entered requiring that each party that has retained or specially employed a person to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony provide a 118written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor and the data or other information considered by the witness in forming the opinions. The parties, upon agreement, or if ordered by the court, shall include in the report any or all of the following: exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.
However, a treating physician who is not tendered as an expert does not have to furnish a report, as set forth in Comment C to the article which states in part:
Furthermore, court orders requiring the exchange of reports of testifying experts should not apply to every witness who may be entitled to express an opinion at trial. For example, when a witness, such as a treating physician or other persons with particular professional or other knowledge, will testify to facts and opinions developed because of then-treatment, observations, perception or connection to a party or event (i.e. coroner, investigating officer, etc.) and have not been specially retained or employed to provide expert testimony, he or she should not be required to generate a report solely for the purposes of the litigation.
Discussion
La. C.C.P. art. 1425 and the comments to that provision simply provide that treating physicians do not have to provide expert witness reports prior to trial when they have not been retained or employed to provide expert testimony and when they testify as to facts and opinions developed because of their treatment, observations, perceptions, or connection to a party or an event.
haAs discussed above, Dr. Steier had a degree in osteopathic medicine, had done an internship in internal medicine and had completed a fellowship in pulmonary and critical care prior to his treatment of Mr. *922 Scarborough. Dr. Steier testified extensively about his treatment of Mr. Scarborough in 1993. Mr. Scarborough had emphysema and inactive TB which, Dr. Steier thought, explained his symptoms. Dr. Steier saw nothing at that time indicative of lung cancer. He stated that Pancoast tumors are diagnosed late because they are hidden behind the ribs and clavicle. The scarring in Mr. Scarborough’s upper lungs due to emphysema and TB also worked to conceal the cancer. Dr. Steier stated that no physician at Conway could have detected the lung cancer any earlier than it was diagnosed.
It was the plaintiffs counsel who asked Dr. Steier whether in 1993, when he treated Mr. Scarborough, he considered himself an expert in diagnosing and treating him for cancer. Dr. Steier replied, “Not for any type of cancer. For lung cancer as a pulmonologist, lung cancer falls under that, yes.”
At the close of the trial deposition, the plaintiff objected to Dr. Steier’s qualifications in internal medicine and pulmonary and critical care. The plaintiff maintained that Dr. Steier could testify only with regard to his observations and opinions at the time of treatment and not as to any opinions or certifications developed since the time of treatment in 1993.
The record shows that Dr. Steier was qualified in internal medicine as well as pulmonary and critical care at the time he treated Mr. Scarborough. His testimony dealt with his professional treatment of Mr. Scarborough. 19/fhe facts also fail to show that the plaintiff was ambushed or surprised by Dr. Steier’s testimony or his qualifications. This case was filed approximately 16 years before it was tried. The plaintiff was aware that Dr. Steier had treated Mr. Scarborough. The plaintiff had ample time for discovery. According to the defendants, the plaintiff never sought to depose Dr. Steier prior to his trial deposition.
JURY TRIAL AS TO CONWAY
Mrs. Wells argues that the trial court erred in denying her motion to have the issue regarding the liability of Conway determined by a jury. This argument is without merit.
The plaintiff originally requested a jury trial as to all parties in this matter and the trial court required a jury bond of $7,500. The plaintiff later amended her petition to add Conway as a defendant. On June 15, 2009, the plaintiff contends that the jury bond was raised to $10,000, but she did not timely supply the additional bond. On August 20, 2010, shortly before the beginning of this trial, the plaintiff filed a motion to have the liability of Conway determined by a jury. In that motion, Mrs. Wells argued that the request for a jury trial by the DPSC should have required a jury trial against Conway also because the DPSC asserted comparative fault against Conway. The trial court denied the motion for a jury trial as to Conway and the plaintiff filed an application for supervisory review with this court which was denied on the showing made. The plaintiff has again raised this issue on appeal.
|⅞1 Legal Principles
La. R.S. 13:5105 provides:
A. No suit against a political subdivision of the state shall be tried by jury. Except upon a demand for jury trial timely filed in accordance with law by the state or a state agency or the plaintiff in a lawsuit against the state or state agency, no suit against the state or a state agency shall be tried by jury.
B. Whenever a jury trial is demanded by the state, state agency, or the plaintiff in a lawsuit against the state or state agency, the party demanding the jury *923 trial shall pay all costs of the jury trial including the posting of a bond or cash deposit for costs in accordance with Code of Civil Procedure Articles 1733 through 1734.1, inclusive.[5]
La. C.C.P. art. 1733 states in pertinent part:
A. A party may obtain a trial by jury by filing a pleading demanding a trial by jury and a bond in the amount and within the time set by the court pursuant to Article 1734.
[[Image here]]
|22C. The pleading demanding a trial by jury shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury.
La. C.C.P. art. 1734 provides in pertinent part:
A. Except as otherwise provided by R.S. 13:3105 et seq., when the case has been set for trial, the court shall fix the amount of the bond to cover all costs related to the trial by jury and shall fix the time for filing the bond, which shall be no later than sixty days prior to trial. Notice of the fixing of the bond shall be served on all parties. If the bond is not filed timely, any other party shall have an additional ten days to file the bond.
Discussion
A plaintiff in a lawsuit against a state agency may demand a jury trial and must pay all costs. Both the DPSC and Conway are state agencies. In the plaintiffs original petition, she sought a jury trial as to all parties and a $7,500 jury bond was set. When the plaintiff amended her petition and added Conway as a party, the trial court increased the bond to $10,000. The plaintiff was informed by the clerk of court on July 1, 2010, that the cash or bond for a jury trial had not been deposited by the plaintiff. After that notice, Mrs. Wells still did not file the additional cash or bond required, but rather filed an additional request for a jury trial as to Conway shortly before the trial in this matter was set to commence. Mrs. Wells argued that, because the DPSC had requested a trial by jury and, because it asserted issues of comparative fault *924 against Conway, then all issues as to Conway should be tried by jury.
The trial court denied the plaintiffs motion and the plaintiff filed a writ application with this court seeking supervisory review of the trial court | ^decision. This court found that, based upon the showing made, exercise of our supervisory jurisdiction was not warranted. Upon review of the merits of the plaintiffs claim, we find that the plaintiff failed to timely meet the requirements for obtaining a jury trial as to Conway. Further, the law does not afford the plaintiff a right to a jury trial against a defendant simply because a code-fendant has asserted a cross-claim against him. The trial court did not err in denying the plaintiffs motion.
LIABILITY OF THE DPSC
Mrs. Wells maintains that the jury erred in finding no liability on the part of the DPSC, which for the majority of his incarceration, housed Mr. Scarborough in the MPDC, run by the Madison Parish Sheriffs Office, rather than in a DPSC facility. She also urges that the trial court erred in giving erroneous jury instructions regarding the standard of care applicable to the DPSC. These arguments are without merit.
Legal Principles
The sheriff has absolute authority over an inmate sentenced to hard labor and committed to the DPSC but housed in a parish jail due to overcrowding even where the sheriff is receiving money from the DPSC to house the inmate. Cooley v. State, 533 So.2d 124 (La.App. 4th Cir. 1988); Harper v. State, Department of Public Safety and Corrections, 96-0047 (La.9/5/96), 679 So.2d 1321.
The sheriff is charged with the safekeeping of prisoners in his jail, including those who are transferred there. La. R.S. 15:704; La. R.S. 15:706(0; Harper v. State, Department of Public Safety and Corrections, supra; Gullette v. Caldwell Parish Police Jury, 33,440 (La.App.2d Cir.6/21/00), 765 So.2d 464. Even though an inmate is in the legal custody of the DPSC, he is in the custody of the sheriff of the parish in whose jail he has been placed, not the custody of the DPSC. Harper v. State, Department of Public Safety and Corrections, supra; Gullette v. Caldwell Parish Police Jury, supra.
La. R.S. 42:1441 provides in pertinent part:
A. The state of Louisiana shall not be liable for any damage caused by a ... sheriff ... within the course and scope of his official duties, or damage caused by an employee of a ... sheriff....
The duty of a sheriff regarding the parish jail is stated in La. R.S. 15:704:
Each sheriff shall be the keeper of the public jail of his parish, and shall by all lawful means preserve the peace and apprehend all disturbers thereof, and other public offenders.
La. R.S. 15:831 provides in pertinent part:
A. The secretary of the Department of Public Safety and Corrections shall establish and shall prescribe standards for health, medical, and dental services for each institution, including preventive, diagnostic, and therapeutic measures on both an outpatient and a hospital basis, for all types of patients. An inmate may be taken to a medical facility outside the institution when deemed necessary by the director. However, in situations which are not life-threatening, the medical facility selected to treat the inmate shall be a part of the state’s charity hospital system. In emergency situations where treatment by a state charity hospital is not available or feasible, the inmate may receive emergency treat *925 ment at the nearest private medical facility. As soon as practicable, the inmate should be transferred to a facility operated by the state’s charity hospital system. Notwithstanding any law to the contrary, all payments to private hospitals or health care providers shall be governed by R.S. 15:824(B)(l)(c). No monies appropriated to the department from the state general fund or from dedicated funds shall be used for medical costs associated with organ ^transplants for inmates or for the purposes of providing cosmetic medical treatment of inmates, unless the condition necessitating such treatment or organ transplant arises or results from an accident or situation which was the fault of the department or resulted from an action or lack of action on the part of the department. However, nothing in this Section shall prohibit an inmate from donating his vital organs for transplant purposes....
The standard of care imposed upon the DPSC in providing for the medical needs of inmates is that services must be reasonable. This duty to provide reasonable medical care for prisoners does not require the maintenance of a full hospital at the site of each prison in order to protect an inmate against every medical risk, but does encompass the risk that an inmate will become sick or be injured and require lifesaving medical attention. Neidlinger v. Warden, Medical Department, 45,235 (La.App.2d Cir.5/19/10), 38 So.3d 1171.
Discussion
Most of the issues the plaintiff complains of regarding the care of Mr. Scarborough occurred while he was housed in the MPDC. Under the statutes and jurisprudence, when a prisoner in the legal custody of the DPSC is placed in the physical custody of a parish sheriff, the DPSC is not liable for actions taken by the sheriffs office.
In 1994, several months after Mr. Scarborough was placed in the MPDC, the Basic Jail Guidelines were implemented. This document was an agreement between the Louisiana Sheriffs’ Association and the DPSC for basic guidelines for housing DPSC inmates in parish jails. The guidelines encompass numerous issues in housing inmates, including medical care. The DPSC was charged with periodic inspections of parish jails to ensure Incompliance ■with the Basic Jail Guidelines. The required inspections were conducted in this case and deficiencies found in the MPDC were quickly corrected. As of September 21, 1994, the MPDC was found to be in compliance with the Basic Jail Guidelines.
Further, after Mr. Scarborough was transferred to DPSC facilities at Elayn Hunt Correctional Center and David Wade Correctional Center, the record shows that his medical needs were met. He was given his prescription medication and was taken to Conway for followup appointments culminating in the diagnosis of his cancer. The record shows that the DPSC fulfilled its duty regarding the care of Mr. Scarborough while he was housed at the MPDC and while housed in DPSC facilities. Therefore, the jury did not err in finding the DPSC to be without liability in this matter.
The jury instructions given in this case were correct. The instructions regarding the DPSC were as follows:
The Sheriff is charged with the safekeeping of prisoners transferred to his jail because of lack of any statute or regulation granting DPS & C control over the Sheriff.
The sheriff has authority over an inmate once he is placed in a parish jail, *926 such that DPSC could not require Sheriff to abide by its policies.
There is no statute or regulation which would give any arm of the DPSC the power to control what a sheriff does with prisoners in his custody.
Even though an inmate remains in the legal custody of the DPS & C, he is in the actual custody of the Sheriff of the parish in whose jail he has been placed, not the custody of DPS & C.
The State of Louisiana shall not be liable for any damage caused by a Sheriff within the course and scope of his official duties, or damage caused by an employee of a Sheriff.
|87The Basic Jail Guidelines set forth general operational guidelines for parish jail facilities specifically relating to DOC inmates.
Periodic inspections of a parish jail for compliance with DOC Basic Jail Guidelines does not give DOC “authority and control” over the facility, so as to create a duty to an inmate.
The Basic Jail Guidelines are not intended either in purpose or practice, to confer upon DOC any part of the absolute statutory authority given to the parish Sheriffs regarding obligations relating to the day-to-day custody of inmates in parish facilities.
These instructions are a correct statement of the law. The trial court did not err in charging the jury with these jury instructions.
LIABILITY OF THE SHERIFF AND THE MPDC
Mrs. Wells argues that the trial court erred in failing to hold the MPDC and the Madison Parish Sheriffs Office liable for negligence. Mrs. Wells argues that the MPDC failed to exercise reasonable care and this failure caused injury to Mr. Scarborough. She points to numerous instances in the medical records which show that the MPDC knew of Mr. Scarborough’s medical needs and failed to meet them, exposing him to unnecessary suffering. This argument is without merit.
Legal Principles
The standard of care imposed upon a confining authority in providing for the medical needs of inmates is that the services be reasonable. Calloway v. City of New Orleans, 524 So.2d 182 (La.App. 4th Cir.1988), writ denied, 530 So.2d 84 (La.1988). See Elsey v. Sheriff of Parish of East Baton Rouge, 435 So.2d 1104 (La.App. 1st Cir.1983), writ denied, 440 So.2d 762 (La.1983); Norred v. Litchfield, 2006-2156 (La.App. 1st Cir.11/2/07),28 977 So.2d 1004; Hardy v. Foti, 2001-1257 (La.App. 4th Cir.2/27/02), 812 So.2d 792.
La. R.S. 15:751 provides:
All jails, prisons, lockups and camps and all facilities, units and rooms of such jails, prisons, lockups and camps where prisoners are detained or confined must meet standards of health and decency which shall be established by the state division of health. The director of the Department of Corrections shall confer with the state health officer or his duly authorized representative concerning the establishment of such standards for all correctional institutions. The state health officer or his duly authorized representative shall periodically inspect all correctional institutions to determine if such institutions are in compliance with the established standards and he shall prepare and issue a report on his findings to the governor, the state hospital director and the administrators of the various institutions.
Discussion
Mrs. Wells points out that the Conway doctors cited the lack of communi *927 cation and follow-up care as significant impediments to the diagnosis of Mr. Scarborough’s cancer. She claims that the sheriffs records show that the doctors’ instructions were repeatedly lost or ignored, nursing notes were not followed, prescription medications were not administered according to instructions, and medical appointments were missed or delayed for months with no explanation.
Mr. Scarborough’s intake records from the MPDC show that he was 5' 10" tall and weighed approximately 130 pounds. He did not list any medications he was taking at that time. However, there was some indication that he had been taking Vicodin for pain. Mrs. Wells testified that her son’s Vicodin was stolen at MPDC and was not replaced. The MPDC records show that Mr. Scarborough complained of left shoulder pain and was given DaMotrin. The nurse made a notation to check with the doctor because Vicodin should have relieved his pain. On October 26, 1993, there is a nurse’s note stating that Mr. Scarborough’s pain medication was taken and that he wanted to see the doctor. According to the nurse at MPDC, Lena Middlebrook, and Dr. Neumann, instructions were given to get a work-up done on Mr. Scarborough to see what was causing his pain.
Ms. Middlebrook testified that inmate medication would be picked up at the pharmacy by the guards. She would place the medication in folders for the inmates. The guards would dispense the medications. All medications were kept locked up.
Pat Smith, an employee at MPDC, testified that medications were passed through a window to inmates who would sign for them. Ms. Smith denied that any inmate was ever denied medication. David Glover, an inmate at MPDC at the time Mr. Scarborough was there, testified that, if an inmate could not get to the window quickly enough, the guards would record that medication had been refused. Ms. Smith stated that Mr. Scarborough was transferred to Hunt Correctional Center because he and his family did not feel that his medical needs were being met.
A notation on November 1,1993, indicated that Mr. Scarborough was sent to Conway for a CT scan or MRI of cervical vertebrae. On November 2, 1993, Mr. Scarborough complained of not getting his medication and the nurse noted that he had a prescription to be filled that day. On November 14, 1993, Mr. Scarborough made a complaint of severe shoulder pain. In February 1994, he asked to see the doctor for shoulder pain.
| spin March 1994, Mr. Scarborough asked to see a psychiatrist because of mood swings and depression. In April 1994, nursing notes show that Mr. Scarborough had a severe skin rash and was being sent to a doctor for evaluation. On July 13, 1994, Mr. Scarborough made a request to see the doctor for stronger pain medication. A nursing note on July 27, 1994, reflects that Mr. Scarborough complained of being out of pain medication. He also refused to take his TB medication because he had been told at the local health unit not to take the medication for more than six months. In August 1994, Mr. Scarborough asked to see Dr. Neu-mann, but when the nurse sent for him, he refused to go to nurse call.
The record contains the medical logs from MPDC showing the administration of medication to Mr. Scarborough. Mr. Scarborough was prescribed Sporanox for treatment of fungal infections from April 30, 1994, to May 12, 1994. He received this medication on a fairly regular basis. From November 1994 to January 1995, Mr. Scarborough was prescribed Feldene for pain; he also received this regularly. Mr. Scarborough was prescribed Naprox *928 en, a nonsteroidal anti-inflammatory (NSATP) drug for pain, from October 12, 1993, through December 12,1994. For the relief of pain, Mr. Scarborough was also given Robaxisal, Cataflam, Piroxicam, and Daypro at various times. Mr. Scarborough was prescribed Elavil for depression from August 16, 1994, to January 1995.
The medical logs from MPDC are not orderly and it is difficult to determine the degree of regularity with which Mr. Scarborough received his medication. While there is some indication that Mr. Scarborough did not | aireceive all of his medicine timely, the evidence is not specific enough to determine whether those discrepancies were or were not rectified quickly. The record shows that Mr. Scarborough regularly complained about shoulder pain and other maladies and was seen by the prison nurse, by Dr. Neumann, and was frequently referred to Conway for further care.
Based upon the record before us, we find that the trial court did not err in failing to find the MPDC or the Madison Parish Sheriffs Office liable for negligence in the care of Mr. Scarborough.
CONCLUSION
For the reasons stated above, we find no error in the trial court’s application of the Daubert standard in allowing or barring expert testimony or in its evidentiary rulings concerning Dr. Steier, Dr. Lazarus, and Dr. Chenier. The trial court did not err in denying the plaintiffs request for a jury trial as to Conway. The trial court did not err in the jury instructions given regarding the legal standard applicable to the DPSC. We find that the trial court did not err in failing to find Conway, the DPSC, the MPDC, or the Madison Parish Sheriff’s Office liable for negligence in this matter.
Costs in this court are assessed to the plaintiff, Leila Wells.
AFFIRMED.

. The DPSC and Sheriff Harmon also filed a motion in limine to exclude the testimony of other witnesses not at issue in this appeal.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., supra, provided the following guidelines for assessing whether reasoning or methodology underlying the testimony is scientifically valid and can be applied to the facts at issue: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique had been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted by the relevant scientific community.

. It was not necessary for this medical malpractice claim to first be presented to a medical review panel. The Medical Liability for State Service Act (MLSSA), La. R.S. 40:1299.39 et seq., exempts prisoners and those pursuing claims as heirs of prisoners from filing requests for medical review panels. See Yen v. Avoyelles Parish Police Jury, 2003-603 (La.App.3d Cir.11/5/03), 858 So.2d 786.

. In 1993, a CT scan was done of Mr. Scarborough’s neck, but it did not show the tumor.

. A "state agency” is defined in La. R.S. 13:5102(A):
A. As used in this Part, "state agency” means any board, commission, department, agency, special district, authority, or other entity of the state and, as used in R.S. 13:5106, any nonpublic, nonprofit agency, person, firm, or corporation which has qualified with the United States Internal Revenue Service for an exemption from federal income tax under Section 501(c)(3), (4), (7), (8), (10), or (19) of the Internal Revenue Code, and which, through contract with the state, provides services for the treatment, care, custody, control, or supervision of persons placed or referred to such agency, person, firm, or corporation by any agency or department of the state in connection with programs for treatment or services involving residential or day care for adults and children, foster care, rehabilitation, shelter, or counseling; however, the term "state agency” shall include such nonpublic, nonprofit agency, person, firm, or corporation only as it renders services to a person or persons on behalf of the state pursuant to a contract with the state. The term "state agency” shall not include a nonpublic, nonprofit agency, person, firm or corporation that commits a willful or wanton, or grossly negligent, act or omission. A nonpublic, nonprofit agency, person, firm or corporation otherwise included under the provisions of this Subsection shall not be deemed a "state agency” for the purpose of prohibiting trial by jury under R.S. 13:5105, and a suit against such agency, person, firm or corporation may be tried by jury as provided by law. "State agency” does not include any political subdivision or any agency of a political subdivision.